**Darnell E. BLACKMON, Petitioner,**

v.

**Gordon ENGLAND, Secretary
of the Navy, Respondent.**

**No. CIV.A. 04–0966(RWR).**

United States District Court,
District of Columbia.

June 26, 2004.

David Patrick Sheldon, Law Office of David P. Sheldon, Washington, DC, for Petitioner.

Jane M. Lyons, United States Attorney's Office, Washington, DC, for Respondent.

### *MEMORANDUM OPINION*

ROBERTS, District Judge.

Petitioner Darnell E. Blackmon, a Lieutenant Commander in the United States Naval Reserve on active duty, requests a writ of habeas corpus restraining respondent, the Secretary of the Navy, from deploying petitioner for duty in Afghanistan. Petitioner alleges that respondent's deployment order is unlawful because it is in contravention of Naval regulations exempting from deployment service members with a disqualifying medical condition which he purports to have, and because petitioner should have been exempt from duty as a conscientious objector. Respondent moves to dismiss the petition, arguing that the court lacks jurisdiction over the matter because the petitioner named the incorrect respondent in an improper jurisdiction. A hearing and oral argument was held on June 25, 2004. Because the Secretary of the Navy is not the proper respondent for this habeas petition and habeas relief for petitioner is not available in this district, respondent's motion to dismiss will be granted.

### *BACKGROUND*

Petitioner has been a Naval Reserve member for over 15 years and is obligated under contract to serve until July 2007

with the Naval Reserve. (Amended Petition for Writ of Habeas Corpus ("Am. Pet.") at Ex. 13 ¶ 5; Ex. 14.) On May 1, 2004, petitioner requested consideration for resignation from service, citing as reasons his moral objection to conflict, the Navy's failure to pay him for drill weekends in a timely fashion, a decreased quality of life that would result from mobilization, hardship to his career as an orthopedic surgeon, and preparation for an Orthopedic Board Examination scheduled for July 9, 2004. (*Id.* at Ex. 13.) On May 7, 2004, the Commander, Navy Personnel Command ("COMNAVPERSCOM"), located in Millington, Tennessee, ordered petitioner to report to the Naval Reserve Center in Tulsa, Oklahoma ("NMCRC Tulsa") for involuntary active duty as an orthopedic surgeon. (*Id.* at ¶ 11; Ex. 4; Respondent's Opp'n to Petitioner's Application for Temporary Restraining Order ("Respondent's Opp'n") at Ex. 2.) COM-NAVPERSCOM ordered the Commanding Officer of the NMCRC Tulsa to begin the screening and mobilization process for petitioner to be deployed to Afghanistan. (*Id.*) Petitioner reported on May 10, 2004 to the NMCRC Tulsa for screening where he discussed with a medical corpsman a shoulder injury he sustained in 1987 and which was aggravated in the past three years. (Am.Pet. ¶¶ 9, 10, 12.) After numerous medical examinations, petitioner subsequently informed the Commanding Officer for NMCRC Tulsa that petitioner believed—and that his doctors had confirmed—that he was not fit to deploy under Navy regulations. (Am.Pet. ¶¶ 12–15.)

The petitioner requested exemption from mobilization by letter to the Chief of Naval Personnel through his Commanding Officer at the NMCRC Tulsa on May 10, 2004. (Am.Pet. ¶ 29.) The Commanding Officer convened an informal Special Cases Board to hear petitioner's request for ex-

emption and recommended to the Naval Personnel Command ("NAVPERSCOM") that petitioner's reporting date be delayed for 60 days. NAVPERSCOM rejected the recommendation and ordered petitioner to report on June 2, 2004 to the Navy Mobilization Processing Site ("NMPS") in Norfolk, Virginia for screening, and to the Naval Reserve Center in Columbus, Georgia on June 6 for ultimate deployment to Afghanistan on June 14, 2004. (*Id.* ¶ 30; Respondent's Opp'n ¶¶ 7–9; Ex. 2.) Petitioner reported to the NMPS where a Navy doctor found him fit for duty as an orthopedic surgeon. (Am.Pet. ¶ 19.) Another examination by another Navy physician on June 4, 2004 concluded that petitioner's shoulder condition rendered him non-deployable. (*Id.* ¶ 20.)

On June 7, 2004, petitioner transferred for processing to his current station, namely, Fort Benning, Georgia, a staging area for deployment overseas. (*Id.* ¶ 21.) There, he is on active duty and under the administrative control of the Naval Reserve Center in Columbus, Georgia. A Fort Benning Army orthopedic surgeon examined petitioner's shoulder and concluded that petitioner was "unable to perform full effort except for brief or moderate periods." (*Id.*) Petitioner alleges that his command contacted the Army doctor to change petitioner's status to deployable, and that on June 10, 2004, his status was changed to deployable. (*Id.* ¶ 24.)

Blackmon filed his petition for a writ of habeas corpus here on June 11, 2004 under 28 U.S.C. § 2241 (2000) naming the Secretary of the Navy as the respondent. Respondent moves to dismiss, arguing that he is not petitioner's immediate custodian within the meaning of the habeas statute and that the court lacks jurisdiction over the petition. Respondent contends that the "custodian of an active duty servicemember, such as petitioner, is the immedi-

ate officer in his chain of command who has control over him." (Respondent's Opp'n at 8.) Petitioner opposes, arguing that the respondent, acting through his agents at the Bureau of Medicine and Surgery ("BUMED") located in the District of Columbia, "implement[ed] the selection process that led to Petitioner's orders to deploy." (Petitioner's Opp'n to Respondent's Mot. To Dismiss at 6.) Because BUMED reviewed and nominated petitioner for deployment to Afghanistan, found petitioner uniquely situated to perform active duty in Afghanistan, and is responsible for "adjudicat[ing] the recall and mobilization to active duty [of] approximately 7,000 Naval reservists" (Respondent's Opp'n Ex. 2 at ¶ 2), petitioner contends that the Secretary of the Navy—acting through his BUMED agents—controlled and commanded his deployment orders, making the Secretary of the Navy the proper respondent in his case. Petitioner stated in oral argument that BUMED did not issue the deployment order and conceded that BUMED could not issue the order requiring petitioner to deploy.

## DISCUSSION

Under 28 U.S.C. § 2241, a person who is "in custody in violation of the Constitution or laws or treaties of the United States" may apply for a writ of habeas corpus in district court. 28 U.S.C. § 2241(c)(3). Writs of habeas corpus may be granted by the district courts within their respective jurisdictions, *id.* at § 2241(a), for "members of the armed services who have been unlawfully detained, restrained or confined." *Schlanger v. Seamans,* 401 U.S. 487, 489, 91 S.Ct. 995, 28 L.Ed.2d 251 (1971). A writ of habeas corpus "shall be directed to the person having custody of the person detained." 28 U.S.C. § 2243; *see also Eisel v. Sec'y of the Army,* 477 F.2d 1251, 1253 (D.C.Cir.1973).

Armed forces detainees may be classified on a scale of types of custody which can determine who the proper custodian is and in which judicial district habeas relief would be available. In the case of traditional prisoner petitioners, "when there is only one custody and one physical custodian[,]" the custodian is the warden at the physical detention site where the petitioner is being held. *al-Marri v. Rumsfeld,* 360 F.3d 707, 712 (7th Cir.2004) (finding that the Secretary of Defense was not the proper respondent for a writ of habeas corpus brought by an enemy combatant held in South Carolina and dismissing petition for lack of jurisdiction). In those cases, "[f]or the purposes of the federal habeas corpus statute, jurisdiction is proper only in the district in which the immediate, not the ultimate, custodian is located" or where the petitioner is incarcerated. *Monk v. Sec'y of the Navy,* 793 F.2d 364, 369 (D.C.Cir.1986).

However, when "custody takes a form other than physical detention—for example, parole or an obligation to report for military service—it is necessary to identify as a 'custodian' someone who asserts the legal right to control [w]hat is being contested in the litigation." *al-Marri,* 360 F.3d at 711. With service members petitioning to separate from the military, this circuit recognizes a distinction between members on active duty and those on inactive duty for the purposes of identifying the proper respondent. In *Eisel v. Sec'y of the Army,* the court noted that the concept of custodianship in the traditional sense is associated with petitioners on active duty with unit assignments or on leave of absence "since the custodian is not an object of speculation as with the inactive reservist. In short, the nature of the custodian [with those maintaining contacts with the military through a chain of command, like an active duty officer, is] similar to the traditional definition of that term." 477 F.2d

1251, 1263 (D.C.Cir.1973). The proper respondent in those circumstances, therefore, is a petitioner's commanding officer.

On the other end of the scale, *Eisel* recognized that inactive reservists disconnected from any base or any one commander who petitioned for separation faced the "practical impossibility of obtaining ... jurisdiction" over a custodian. *Id.* at 1262. The court noted that inactive reservists, unlike active duty members, have no custodians that

> exercise[ ] any real control over the petitioners. The commanders of the record centers and the bases to which petitioners have been ordered to report have never had anything to do with the denial of the requests for release. The record centers' commanders have been mere shadows through which others worked and the relationship of the base commanders is at best potential. By like token, the civil service Secretaries' relationship to the petitioners is extremely remote.

*Id.* at 1262. At base, the court found that it was the "bureaucracy" that denied the separation petitions for the inactive reservists. *Id.*

*Eisel* therefore rejected as too narrow the respondents' contention in that case that the Secretary of the Navy and the Air Force were not proper respondents because they were not the "immediate custodians" of the petitioners who sought discharge from the inactive reserves as conscientious objectors. 477 F.2d at 1258. "Nowhere does [§ 2241] speak of an 'immediate custodian' or intimate that an action must necessarily be instituted in the location of such an 'immediate custodian,' even if it were possible to grant substance to the vague concept of 'immediate custodianship.' " *Id.*

However, the court also acknowledged that "[a]ccepting ... the nature of the inactive reservists' custody and his custodian does not mean ... that he may choose his forum by simply appearing personally in a jurisdiction, thereby bringing his mental jailer along with him." *Id.* at 1263. *Eisel* therefore created the rule[1] that where an inactive reservist's custodian is unidentifiable, the petitioner's home or domicile would serve as the proper jurisdictional forum for a habeas challenge. *Id.* at 1265. Thus *Eisel* suggested that the first step in this functional analysis would be to determine whether the court had jurisdiction over the matter based on the petitioner's contacts[2]—namely, whether it

---

1. The court factored in whether 1) the forum is close to the records of the case and the witnesses who have to appear; 2) the forum would promote a fair distribution of habeas cases among the districts; 3) the forum would be convenient for the petitioner in which to appear; 4) the forum would be convenient for the Government; 5) most importantly, whether the forum would be easily determinable; and 6) the extent to which a single forum would be possible to prevent forum shopping. *Eisel,* 477 F.2d at 1254.

2. The importance of a petitioner's contacts with the forum is supported by the Supreme Court's decisions in *Schlanger v. Seamans,* 401 U.S. 487, 491, 91 S.Ct. 995, 28 L.Ed.2d 251 (1971), and *Strait v. Laird,* 406 U.S. 341, 344, 92 S.Ct. 1693, 32 L.Ed.2d 141 (1972).

In *Schlanger,* the Supreme Court held that an Air Force reserve member on temporary duty studying at the University of Arizona could not bring a writ of habeas corpus in Arizona against the Secretary of the Air Force, the Commander of Moody Air Force Base in Georgia to which the petitioner was reassigned, or the Commander of the base in Arizona who had no contacts with the petitioner because "Arizona has no custodian within its reach against whom its writ can run.... [E]ven ... assum[ing] that petitioner is 'in custody' in Arizona in the sense that he is subject to military orders and control which act as a restraint on his freedom of movement, the absence of his custodian is fatal to the jurisdiction of the Arizona District Court." 401 U.S. at 491, 91 S.Ct. 995. The

was his place of domicile—and the second, to name a ranking military officer who could be found in that forum jurisdiction. In describing who could be named as the proper respondent, the court described "the officer who signed the order denying the petitioner release from the military. Another possible alternative would be to 'name' the highest ranking military officer of that branch of the Armed Services of which petitioner is part who can be found in the forum court's jurisdiction." *Id.* at 1265 n. 41.

For neither active nor inactive duty petitioners, however, is the concept of custodianship broad enough to name the Secretary of an armed services department as a respondent—based solely on his or her position of authority but where the Secretary engaged in no decision-making specific to a petitioner's request for relief—in a jurisdiction with which the petitioner has had no contacts. For inactive reservists, the court in *Eisel* stated that the "civilian Secretaries' relationship to the petitioners is extremely remote," *id.* at 1262, and noted that an odd consequence would result from permitting the inactive reserves to proceed against the Secretaries. If the court permitted the inactive reserves to name as custodians the Secretaries, "it seems only reasonable to assume that they are the 'custodians' of all military personnel. There has been no suggestion that the Secretaries assume a position in relation to inactive reservists that they do not have with all other members of the military. If inactive reservists may proceed against the Secretaries because the latter are their custodians, we cannot see why any other member of the military should not be permitted so to proceed." That, the

court considered "disruptive" with "little ... logic." *Id.* at 1255 n. 5.

■ Here, petitioner states in his papers and asserted in oral argument that he has been an active duty member of the United States Naval Reserve for all times relevant to this petition, duly following orders from his commanding officers. As such, the Secretary of the Navy is not the proper respondent for his petition for writ of habeas corpus. At a minimum, the Secretary of the Navy does not exercise the type of "real control," *Eisel,* 477 F.2d at 1252, exercised by custodians for the purposes of habeas petitions. *Cf. Padilla v. Rumsfeld,* 352 F.3d 695, 706 (2d Cir. 2003) ("[T]he Court [in *Strait*] did not discuss whether the Secretary was the proper respondent. In any event, it is clear there, unlike here, that the Secretary had no direct responsibility for the denial of Strait's application for conscientious objector status."). The petitioner has, at least nominally, a commanding officer at Fort Benning where he is now stationed and it is undisputed that he receives administrative orders from the Naval Reserve Center in Columbus, Georgia. The petitioner does not, nor has he ever in the relevant time frame for this petition, received any order from the Secretary of the Navy. It is also undisputed, as petitioner conceded in oral argument, that BUMED did not, and does not, exercise daily control over deployment and non-deployment orders for the petitioner. While BUMED may nominate potential reservists for duty, the executing authority comes through, as petitioner described at oral argument, COMNAVPERSCOM. (*See also* Petitioner's Opp'n at 6) ("[Commander McIntyre of COMNAVPERSCOM] was responsible

Supreme Court clarified in *Strait* that the "jurisdictional defect in *Schlanger* ... was not merely the physical absence of the Commander of Moody [Air Force Base] from the District of Arizona, but the total lack of formal contacts between Schlanger and the military in that district." 406 U.S. at 344, 92 S.Ct. 1693.

for drafting and releasing official orders recalling Petitioner to active duty on behalf of the Chief of Naval Personnel, Millington, Tennessee.").

Petitioner does not establish how the Secretary of the Navy's activity here is different from any other situation in which an active duty soldier is ordered to deploy. If petitioner is right in naming the Secretary as a respondent, then any active duty soldier could conceivably bring a habeas petition in the District of Columbia—a possibility that the *Eisel* court dismissed. Although petitioner cites to 10 U.S.C. § 5013(b)(7) as granting the Secretary of the Navy the responsibility for mobilizing the Navy, and argues therefore that it is he who has control over petitioner's deployment status, that statute is insufficient to establish that the Secretary has the "direct responsibility" over petitioner's deployment order that is indicative of custodianship.[3] *Padilla*, 352 F.3d at 706. Petitioner has established no facts to suggest that the Secretary of the Navy directly operated through officers in the District of

Columbia specifically to order petitioner to deploy. *See Strait*, 406 U.S. at 344, 92 S.Ct. 1693 (noting that a remote commanding officer was a custodian because he directly enlisted the aid and directed the activities of agents in another jurisdiction).

■ Petitioner also argues that his circumstance is different from that of the ordinary active duty service member because his commanding officer at the Naval Reserve Center in Columbus, Georgia is only a "nominal" custodian. (Petitioner's Opp'n at 13.) To the extent that petitioner's commanding officer is unidentifiable, or his orders are controlled by the Navy as an institution—as opposed to one commanding officer in petitioner's chain of command—petitioner's lack of contacts here still makes this district unavailable to petitioner for pursuing his habeas claims. The District of Columbia is not petitioner's domicile; it has no proper custodian within its reach against whom this court's writ could run; and it generated no deployment orders to petitioner.[4] Whether a proper

---

3. The respondent argues that *Monk v. Sec'y of the Navy* is controlling in this case. *Monk* is easily distinguishable as presenting facts akin to the common prisoner petitioner context. In *Monk*, a corporal in the Marine Corps who had been court-martialed, tried and found guilty of murdering his wife under the Uniform Code of Military Justice, and incarcerated at the United States Disciplinary Barracks in Kansas, petitioned for writ of habeas corpus in the District of Columbia, naming the Secretary of the Navy as the respondent. The court rejected Monk's argument that the Secretary of the Navy was his "ultimate custodian" and therefore the proper respondent. Citing *Guerra v. Meese*, 786 F.2d 414 (D.C.Cir. 1986), in which the court held that the United States Parole Commission was not the custodian of inmates at various federal prisons around the country, and *Sanders v. Bennett*, 148 F.2d 19 (D.C.Cir.1945), in which the court held that the Attorney General could not be considered the custodian of a federal prisoner because he supervises the Federal Bureau of Prisons, the court found that Monk's

custodian for habeas corpus purposes was the commandant at the facility where he was incarcerated. Like the typical federal prisoner, Monk was physically held in one location by one custodian, making that custodian the proper respondent of a habeas action. *See al-Marri*, 360 F.3d at 712. Although not controlling, *Monk* shows that the Secretary of the Navy is in a position like those analyzed in *Guerra* and *Sanders*. *But see Koh v. Sec'y of the Air Force*, 719 F.2d 1384, 1384 (9th Cir. 1983) (deciding, without specific analysis of whether the Secretary of the Air Force was the proper respondent, a habeas petition for a putative conscientious objector).

4. Petitioner also argues that jurisdiction is proper in the District of Columbia under the long-arm jurisdictional analysis of *Padilla v. Rumsfeld*, 352 F.3d 695 (2d Cir.2003). In *Padilla*, the Second Circuit held that Secretary of Defense Rumsfeld was the proper respondent for a habeas petition brought by an enemy combatant held on a brig off of South Carolina because of Rumsfeld's "unique role"

custodian would be a commander in Georgia or Tennessee or elsewhere, and whether the proper forum for seeking habeas relief is in one of those locations, petitioner cannot bring a habeas petition in the District of Columbia against the Secretary of the Navy.

## CONCLUSION

Petitioner was deployed into active duty by the Commander of Navy Personnel Command in Tennessee and is currently stationed at Fort Benning, Georgia, under the administrative command of the Naval Reserve Center in Columbus, Georgia. Because the Secretary of the Navy is not petitioner's custodian and habeas relief for petitioner would be unavailable in the District of Columbia, respondent's motion to dismiss will be granted. A final Order accompanies this Memorandum Opinion.

## *ORDER*

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

ORDERED that respondent's motion to dismiss [9] the petition for writ of habeas corpus be, and hereby is GRANTED. It is further

ORDERED that petitioner's motion for a temporary restraining order [2, 6] be, and hereby is, DENIED as moot. It is further

ORDERED that this court's Order [5] prohibiting respondent from executing its

deployment order against petitioner be, and hereby is, VACATED.

This is a final, appealable Order.

---

in recommending to the President pursuant to an Executive Order that Petitioner be held as an enemy combatant. *Id.* at 707–708. The court limited its holding to cases involving an enemy combatant "in circumstances congruent with Padilla's designation and detention." *Id.* at 708. Once the court determined that the extraordinary circumstances present in Padilla rendered Rumsfeld the proper re-

spondent, it analyzed whether the New York court had personal jurisdiction over Rumsfeld. Based on transactions and business Rumsfeld conducted to bring Padilla to New York and then transfer him to South Carolina, the court found no trouble finding personal jurisdiction over Rumsfeld. *Id.* This case does not present the unique circumstances present in *Padilla.*